## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

FINE CONSULTING, INC.
d/b/a THE FINE POINT GROUP and
RANDALL A. FINE,

                              **Plaintiffs.**

v.                                                  Civ No. 12-004 LH/RHS

GEORGE RIVERA, FRANK DEMOLLI,
STUART ZUCKER, EDDIE LOPEZ, and
ALLEN MOSLEY,

                              **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion to Dismiss for Failure to Exhaust Tribal Remedies (Docket No. 13).[1]  On April 17, 2012, United States Magistrate Judge Robert Scott entered an Order (Docket No. 28), which resulted in a stay of all matters until a decision has been issued on the immediate motion to dismiss.  In July 2012, both parties filed motions to supplement the record (Docket Nos. 31 and 34) in connection with the pending motion to dismiss, seeking Court approval for filing additional exhibits, which were attached to these motions.  Briefing on these motions to supplement was completed on August 17, 2012.  These motions were recently granted.  (Docket Nos. 39 and 40).

The Court, having considered the motion to dismiss, briefs of the parties, the record before

---

[1]  In support of their motion to dismiss, Defendants filed three exhibits, to-wit: the Affidavit of Frank Demolli, along with 14 attachments (Docket Nos. 13-1 and 13-2) and the Affidavit of Allen Mosley (Docket No. 13-3).  Plaintiffs' Response to the Motion (Docket No. 17) was accompanied by three exhibits (Docket Nos. 17-1, 17-2 and 17-3).  Defendants' Reply brief (Docket No. 22) attached Exhibits O-Q (Docket No. 22-1).

the Court and applicable caselaw, concludes that Defendants' Motion to Dismiss for Failure to Exhaust Tribal Remedies is well-taken and will be **granted**.  It is the judgment of this Court that the tribal court should be given precedence and afforded a full and fair opportunity to determine the extent of its own jurisdiction over the claims set forth in the Complaint in this matter and that this matter will be dismissed without prejudice.

## I.  Factual Overview of This Case

This is a diversity lawsuit, wherein Plaintiffs allege tortious interference with a Consulting Agreement (Compl., Count I) and with an Employment Agreement (*Id*., Count II).  The agreements involved are contracts between Plaintiffs and two corporations chartered under the laws of the Pueblo of Pojoaque, a federally recognized Indian tribe ("Tribe"), with its headquarters in New Mexico.  The tribal corporations are Buffalo Thunder, Inc. ("BTI") and Pojoaque Gaming, Inc. ("PGI")(collectively known in the agreements and herein as the "Company").  Both of these corporations are owned by Buffalo Thunder Development Authority ("the Authority"), a political subdivision and unincorporated instrumentality of the Pueblo of Pojoaque.

Plaintiff, The Fine Point Group ("FPG") is a Kentucky corporation, headquartered in Las Vegas, Nevada.  Plaintiff Randall Fine is a minority shareholder.  Compl., ¶ 2.  Mr. Fine is a resident of Florida, and is "an executive in, and expert consultant for, the casino gaming industry, including tribal casinos. . . ."  *Id*., ¶ 3.  FPG provides consulting and management services to the casino gaming industry, including tribal casinos operating pursuant to the federal Indian Gaming Regulatory Act, 25 U.S.C. § 2701, *et seq*., ("IGRA").  *Id*., ¶ 2.

The five named Defendants are:

(1)  George Rivera (member of the Tribe, Governor of the Tribe, President of the Company,

2

and Chairman of the Pojoaque Gaming Commission ("PPGC").  He is a New Mexico resident).  (*Id.*, ¶ 4).

(2)  Frank Demolli (legal counsel to the Tribe, to the PPGC and to a judge on the Tribal Court.  During the period in question, he had no legal ties to the Company and was not a Company employee.  He is a New Mexico resident, but is not a member of the Tribe). (*Id.*, ¶ 5).

(3) Stuart Zucker (Executive Director of PPGC, New Mexico resident, but not a member of the Tribe).  (*Id.*, ¶ 6).

(4) Eddie Lopez (member of the PPGC, member of the Tribe, and a New Mexico resident).  (*Id.*, ¶ 7).

(5) Allen Mosley (former Chief Executive Officer ("CEO") of the Company, who was terminated in that position when Mr. Fine became CEO.  Mr Mosley subsequently had no legal or official role with the Company.  He is a New Mexico resident, but is not a member of the Tribe).  (*Id.*, ¶ 8).

### A.  Allegations of the Complaint

The Complaint for Tortious Interference with Contracts and Money Damages (Docket No. 1)("Complaint") is 31 pages in length.  Plaintiffs seek monetary damages against the five individually named Defendants for alleged  tortious interference with agreements entered into by and between Plaintiffs and the Company.  These agreements are discussed in greater detail below, and are attached to the Complaint as Exhibits 1 and 2.

Plaintiffs allege that they were hired by the Tribe and its bondholders to bring professional management and gaming expertise to the Company, and to establish fiscal and financial discipline and integrity to the Tribe's casino operations, in light of financial distress and underperformance,

which caused the Tribe to miss required payments on its outstanding $245 million bond in June and November of 2009.  (Compl., ¶¶ 18, 22).  They allege that Plaintiff Fine's Employment Agreement (Compl., Ex. 1) provided that Fine would serve as the Company's Chief Executive Officer and that he would exercise full authority over the tribal gaming operations with direct supervisory authority over all Company employees other than the Chief Financial Officer.  *(Id.,* ¶ 23).  They allege that, upon execution of Fine's Employment Agreement, the Company agreed to terminate Mr. Mosley as CEO, that Defendants were on notice that Fine would replace Mosley as Company CEO, and that Mosley would no longer have any responsibility for, or authority over, operations of the Company and the Tribe's gaming operations.  *(Id.,* ¶ 25).

The Company also entered into a Consulting Agreement (Compl., Ex. 2) with the Fine Point Group for FPG's provision of comprehensive marketing consulting services for the Company. *(Id.,* ¶ 26).  Plaintiffs allege that various actions by Defendants were in violation of the IGRA; that their actions were deliberately and directly inconsistent with, and undermined, the ability of Plaintiffs to perform their agreements with the Company; that these actions were either contrary to law, or undertaken for the purpose of interfering with these agreements and with Plaintiffs' ability to perform under these agreements.  *(Id.,* ¶¶ 29, 30, 31).  Paragraph 32 of the Complaint sets forth many illustrations of actions by Defendants that allegedly interfered with Plaintiffs' ability to perform their agreements with the Company.

Paragraph 33 of the Complaint alleges that Defendants' actions in January and February 2011 seriously undermined Fine's ability to perform his duties as Company CEO, prompting him to send a March 10, 2011 letter to Rivera in Rivera's capacity of the President of the Company, invoking Fine's Employment Agreement's 30-day Notice to Cure provision.  Fine's letter states that the Company had taken numerous actions that diminished his position, authority, duties and/or

4

responsibilities as the Company's CEO, thereby materially breaching the Employment Agreement. Fine's letter identified 31 separate activities by the Company and various Defendants, that he contended were undertaken for the purposes of (a) preserving the *status quo* as to their ongoing policies and disbursements of casino revenue for their personal gain; and (b) preventing FPG from performing its consulting duties set forth in the Consulting Agreement. (*Id*., ¶ 34). This letter listed alleged violations of federal law and regulations, including actions by various Defendants using their official positions to advance their personal interests. (*Id*., ¶ 37).

Plaintiffs allege that, despite Defendants' efforts to undermine their actions, they succeeded in producing improved financial performance by the Company. (*Id*., ¶ 38). Plaintiffs allege that by March 10, 2011, it was apparent that the Company's improving performance would result in FPG's earning substantial success fees, in excess of its $90,000 monthly guarantee in accordance with the provisions of the Consulting Agreement. (*Id*., ¶ 39).

After Defendants received Fine's March 10, 2011 letter, Plaintiffs allege that Defendants developed a scheme whereby they could avoid disclosure of their personal, impermissible participation in the use of casino revenues  and developed a plan to: (a) terminate the Employment Agreement and Consulting Agreement; (b)  avoid having to pay to FPG the potentially substantial success fees; and (c) illegally continue the undisclosed use of casino revenues. (*Id*., ¶¶ 40, 41).

Plaintiffs allege that Defendants directed the Company to terminate Fine's Employment Agreement, revoke his tribal gaming license, and to terminate the Consulting Agreement. (*Id*., ¶ ¶42-54). Plaintiffs allege that many actions, by Rivera and Zucker, were taken in abrogation of their official duties and responsibilities, as Company President and as PPGC Executive Director respectively. They allege that the revocation of Fine's gaming license effectively revoked FPG's ability to serve the Company (*Id*., ¶ 47), and that prior to these terminations, neither Zucker nor any

other Pueblo representative had ever required that FPG or any of its officers or employees obtain tribal gaming licenses.   *Id.*  ¶ 51.

Count I of the Complaint (¶¶ 64-74) alleges tortious interference with Fine's Consulting Agreement.  It alleges that Fine's termination was in breach of Section 1(b) of the Consulting Agreement, which strictly limited termination prior to the end of the contract term; and, that said termination was  in violation of Pojoaque tribal law.  It alleges that Defendants acted with improper motives and by use of improper means to cause the breach, without justification and without privilege, in order to conceal, and to prevent disclosure by FPG and Fine, of Defendants' continuing diversion of casino revenues to their personal advantage, by improperly booking the diverted funds as "costs of operation" of tribal gaming operations.  Plaintiffs allege that each Defendant played an active and substantial part in causing the termination of the Consulting Agreement.  They allege that Defendants first caused the revocation of Fine's tribal license in violation of the Tribal Gaming Ordinance and applicable federal law, and then cited the revocation of the license as the sole reason for terminating the Consulting Agreement.  Plaintiffs allege that these actions were illegal under tribal law, as well as state and federal law, that they violated the terms of the agreement, and were intended to cause a breach of the agreement and to cause financial damage to FPG.  Plaintiffs allege that in causing the termination of the Consulting Agreement, Defendants acted outside the scope of their authority and tribal sovereign immunity, because the Tribe is powerless to convey the right to violate any law.

Count II contains nearly the same allegations for tortious interference with the Employment Agreement.  (*Id.*, ¶¶ 74-84).  Count II is limited to allegations regarding Fine's individual Employment Agreement with the Company.  Count II does not contain the extensive allegations regarding the gaming license revocation that are contained in Count I.

Plaintiffs' Complaint seeks relief in the form of money damages allegedly suffered due to Defendants' tortious interference with both agreements, as well as punitive damages, costs, attorney fees and all other expense of this litigation.

**B.  Exhibits to the Complaint**

Exhibit 1 to the Complaint is the Employment Agreement between the Company and Plaintiff Randall A. Fine, an individual.  The scope of this agreement was to set forth the terms of Fine's employment as the CEO of the Company, that is, his employment as CEO of BTI and PGI. This Employment Agreement contains provisions dealing with Fine's employment, including the CEO's employment period[2]; his duties, powers, authority and reporting requirements.  One requirement was that he obtain a gaming license from the appropriate gaming authority.  The agreement specifies restrictions on Fine's authority, his salary, benefits, and termination by either party to the agreement.  (Ex. 1 at 3-7).  It includes  sections about confidential information; work product; non-competition, non-solicitation and non-disparagement; and, the requirement for notice between the parties.  (Ex. 1 at 7-9).  Paragraph 7(g), entitled "Governing Law, Jurisdiction and Venue" states

> This is a consensual employment agreement and shall be governed exclusively by the laws of the Pueblo and subject to the exclusive jurisdiction of the Pueblo of Pojoaque Tribal Court.  Each party hereto hereby consents and agrees to the application of the laws of the Pueblo and the exclusive personal and subject matter jurisdiction of the Pueblo of Pojoaque Tribal Court.  Each party hereto hereby irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum non conveniens, that either of them may now or hereafter have to the bringing of any such action or proceeding in the tribal court.

---

[2]  Fine's employment began on the date specified in a notice from the Company which was not a part of the Agreement.  His termination date was September 30, 2013, unless he was otherwise terminated pursuant to the Agreement.  Ex. 1 at 3.

Exhibit 2 to the Complaint, entitled "Database Marketing Consulting Agreement" ("Consulting Agreement") was entered into by the Company and the Fine Consulting, Inc. d/b/a The Fine Point Group. This Consulting Agreement contains provisions relating to the term and potential termination of it; details about the comprehensive marketing consulting services to be provided; reporting structure; payment for services rendered; a "success fee," as set forth in Appendix C to the Consulting Agreement; reimbursement of expenses; independent contractor status of the consultant; confidential information; lack of consultant's authority to bind the Company; non-competition, non-solicitation and non-disparagement provisions; regulatory considerations, including that the Consulting Agreement is contingent on the continued approval and compliance with the Pueblo of Pojoaque Gaming Commission; the requirement of compliance with applicable laws and cooperation with the Company in any investigations; consultant's grant to Company of license to use consultant properties. Similar to the Employment Agreement, Paragraph 20(f) of the Consulting Agreement contains language to the effect that it shall be governed exclusively by the laws of the Pueblo of Pojoaque, and is subject to the exclusive jurisdiction of the Pueblo of Pojoaque Tribal Court.

Exhibit 3 to the Complaint, is a December 9, 2011 decision from the Tribal Court, dated December 9, 2011. This decision considered issues on appeal from the Pueblo of Pojoaque Gaming Commission, and was issued following a hearing on October 26, 2011. The basic underlying facts to the controversy involved in this appeal were: that Randall Fine received a letter from George Rivera, President of BTI and PGI, terminating Fine's Employment Agreement on March 14, 2011; that later that same day, Fine received a letter from Stuart Zucker, Executive Director of the PPGC, informing him that his gaming license had been revoked and was no longer valid on the Pueblo of Pojoaque; that on March 15, 2011, Fine received a letter from Zucker, Executive Director of the

8

PPGC, stating that, because the principals of the Fine Point Group no longer possessed licenses required for Class III gaming services, the Fine Point Group was prohibited from providing further services to the Pueblo of Pojoaque Gaming Corporations.

In its 14 page decision, the Tribal Court held that Fine's license was improperly revoked; that his gaming license should be returned to *status quo ante* and thus to its March 14, 2011 status; that the PPGC's March 15, 2011 prohibition on the Fine Point Group from providing further consulting services was premised on an improper license revocation and was *void ab initio,* and that therefore the PPGC could not prohibit the Fine Point Group from providing consulting services. The Court has been apprised of subsequent tribal proceedings, by way of both parties' supplemental submissions to the Court. There is no indication in the record that a decision has been made by the Tribal Court on the tort issues raised in this lawsuit.

### C.  Summary of the Claims in This Lawsuit

Plaintiffs allege that the Defendants have tortiously interfered with their two agreements with the Company. The casino is located on tribal land and the casino is a tribally owned enterprise. Paragraph 32 of the Complaint alleges approximately 39 "illustrative" actions of Defendants that undermined Plaintiffs' ability to perform their roles for the Company, as contracted for in the Consulting Agreement and Employment Agreement. With one exception[3], Plaintiffs fail to indicate

---

[3] On page 14 of their brief, Plaintiffs refer to Paragraph 32(k)(k) of the Complaint, which claims that "Rivera continuously pressured Fine to pay him $40,000 cash to rent a small, one-bath investment property Rivera owned in Santa Fe, despite the fact that Fine's Employment Agreement specifically provided that his housing would be provided at the Company's facility at no cost." Contrary to Plaintiffs' implications, this paragraph does not specify where this "continuous pressure" from Rivera actually occurred. Likewise, Paragraph 6 of Fine's Affidavit (Ex. B to Resp. Br.) indicates that Rivera asked him about renting this property "both in person and by text message," however no location for this activity is specified. This Affidavit later states that Fine preferred being housed on-property at Buffalo Thunder, which was on tribal land. Paragraph 12 of Fine's Affidavit states that he and his wife met Rivera and his family in Santa Fe, on one occasion, to view the home. Paragraph 16 states that after Fine refused to rent the home, "Mr. Rivera immediately turned hostile to both me and all of The Fine Point

that any of the allegedly tortious activities occurred off of tribal land.  Given the context that

Defendants' actions were related to interfering with consulting and management services for the

Tribe's casino, the Court accordingly presumes that all but one of the many alleged activities

occurred on tribal land.  This one occurrence in Santa Fe does not change the complexion of this

lawsuit as one which overwhelmingly occurred on tribal land.


### D.  Defendants' Motion to Dismiss

Defendants ask this Court to dismiss this action due to Plaintiffs' failure to exhaust their

tribal remedies in the Pueblo of Pojoaque Tribal Court.  They characterize this lawsuit as being a

> disagreement about the scope of authority conferred upon Plaintiffs or retained by others
> within the Pueblo's governmental structure under Plaintiffs' contracts and per the Pueblo's
> customs, traditions and laws.  Resolution of those disputes will require examination of those
> customs, traditions and laws and the language of Plaintiffs' contracts.  Those issues cannot
> be resolved solely by examination of the contracts.  Those disagreements led to termination
> of Plaintiffs' contracts when the Pueblo entities would not accede to Plaintiffs' views and
> demands on those issues, and the relationship of the parties became unworkable.

Def.s' Mot. Dismiss ¶ 2 (Docket No. 13) (citing Demolli Aff. ¶ 8).

Defendants contend that all of Plaintiff's claims arise in the context of:  (a) commercial

_____

Group staff *working on-site at the project*, and I believe his anger at us for not renting the home directly led to the
illegal termination of the agreement in mid-March." (emphasis added).  Fine's Affidavit references other conduct by
Rivera, that occurred subsequent to his refusal to rent Rivera's home in Santa Fe.  No location for this conduct is
specified, however the Court presumes that all but the viewing of the Santa Fe property occurred on tribal land.
Paragraph 17 of Fine's Affidavit states: "It is my view that none of this would have happened had I been putting
$40,000 per year into Mr. Rivera's pockets, as he wished, and that much – if not all – of this conduct was
punishment for not respecting the culture that required unethical, if not illegal, insider payments."  Paragraph 18
states:  these actions were not part of Mr. Rivera's role as a Pueblo leader.  The home was not on the Pueblo, was not
owned by the Pueblo or any Pueblo entity, and the funds would have gone to Mr. Rivera personally, and not any
Pueblo-related entity.  Rather, I believe they were designed to force payments to him personally for his and his
family's own personal benefit."  Fine characterizes this as "private off-reservation activity" of Rivera, that is not
subject to the jurisdiction of the Tribal Court "because it does not impact the political integrity, economic security,
or health and welfare of the Tribe."  Resp. Br. at 16.  This characterization overlooks the fact that only the viewing
of the Santa Fe property, is activity that Fine has specifically identified as occurring "off-reservation."  Indeed, Fine
has not specified a location for the remainder of the alleged conduct, including the allegedly illegal termination of
his agreement with the Tribe.

dealings and consensual commercial relationships (the Employment Agreement, Consulting Agreement and Fine's Pueblo of Pojoaque gaming license) between Plaintiffs and several Pueblo of Pojoaque governmental entities or instrumentalities for whom Defendants serve as officials, officers or employees; (b) the termination of those contracts; (c) the revocation of Fine's gaming license; and, (d) various disputes grounded in those relationships, all involving actions and decisions of the Defendants occurring on Pueblo of Pojoaque grant lands.  Mem.Supp.Def.s' Mot. Dismiss at 1 (Docket No. 14).

Defendants assert that Fine was hired as an employee, and not as an independent contractor. They emphasize that both agreements state that all disputes arising from the Agreements would fall within the exclusive jurisdiction of the Pojoaque Pueblo Tribal Courts and would be "governed exclusively by the laws of the Pueblo." *See* Ex. 1, § 7(g); Ex. 2 § 20(f).

Defendants rely on *National Farmers Union Ins. Co. v. Crow Tribe of Indians*[4] and *Iowa Mutual Ins. Co. v. LaPlante*[5], under which they maintain that, where a party seeks to secure a federal court ruling in a civil cause of action arising on lands within Indian Country, based on voluntary transactions or other consensual relationships between one of the parties to the dispute and a tribal member, tribe or tribal entity of that tribe (or pueblo), the federal court must dismiss the federal suit until plaintiff has exhausted its tribal remedies – so long as there exists colorable tribal court jurisdiction over the claims plead under the case of *Montana v. United States.*[6]  They argue that Pojoaque Tribal Court clearly has colorable jurisdiction to adjudicate those claims under *Williams v. Lee*, 358 U.S. 217 (1959), and under the *Montana* case and its progeny, and that the tribal forum

---

[4] 471 U.S. 845 (1985).

[5] 480 U.S. 9, 18 (1987).

[6] 450 U.S. 544 (1981).

11

is the appropriate forum for the legal defenses they will ultimately raise.

Defendants contend that this exhaustion rule applies, where (as here) a plaintiff seeks relief against a tribal entity or officials, officers, and employees, including in-house attorneys, acting in their official capacities, based on actions they took on tribal land, in connection with the subject transactions or consensual relationships, and that this rule applies without regard for the defendants' status as tribal members or non-members.  Defendants argue that, because Plaintiffs have not exhausted their tribal remedies insofar as their claims are concerned, they must be dismissed.

Defendants argue that whether or not this tort is even actionable under the customs, traditions and laws of the Pueblo of Pojoaque, and if so, what its elements are, should all be controlled by the Pueblo's law, not by New Mexico or federal law, and that this further heightens Plaintiffs' duty to exhaust, and this Court's duty to require exhaustion, of Plaintiffs' tribal remedies.

### E.  Plaintiffs' Response to Motion to Dismiss

Plaintiffs make three basic arguments that Defendants' motion to dismiss must be denied. First, they argue that the Tribal Court lacks jurisdiction – a fact that removes this matter from the purview of the exhaustion doctrine.  Plaintiffs characterize this as a personal dispute between them and the Defendants, involving  tortious acts committed by each of the five individual Defendants, undertaken for their own personal gain, causing financial harm to Plaintiffs.  Pursuant to the *Montana* case, they contend that Plaintiffs never consented to tribal court jurisdiction over the allegedly illegal activities of Defendants that were deliberately taken to injure them, and that this is not a suit against the Tribe that implicates the political integrity or economic security of the Tribe. They argue that three of the Defendants are not tribal members and that critical tortious acts occurred off the reservation, outside the territorial jurisdiction of the Tribe.

12

Secondly, they argue that, despite an absence of tribal court jurisdiction, even if Plaintiffs were required to exhaust tribal remedies, they have done so. In support of this argument, they cite the Court to proceedings in the Tribal Court, concerning Fine's allegedly improper license revocation, that forms part of the basis of their claims.

Plaintiffs' third argument is that, even if the Court were to interpret the tribal exhaustion doctrine to include tort claims, their claims fall within the exceptions to the tribal exhaustion doctrine. One exception to the doctrine upon which Plaintiffs rely is that Defendants' assertion of tribal jurisdiction is motivated by a desire to harass and is conducted in bad faith. Another exception they assert is that this lawsuit does not involve a consensual relationship between the parties and does not impact the political integrity or economic security of the Tribe. Finally, they assert that imposing the exhaustion requirement would be futile and would serve no purpose other than delay.

## II.  Tribal Exhaustion Doctrine

The doctrine of tribal exhaustion is a judicially created rule, dictated by comity rather than jurisdiction concerns, which requires federal courts to defer to the tribal courts whenever federal and tribal courts have concurrent jurisdiction over a claim, in order to encourage tribal self-government. It generally provides that the parties to any case arising on Indian land or involving Indians must exhaust their tribal remedies before a district court may evaluate the existence of a tribal court's jurisdiction. Exhaustion is "especially appropriate" when tribal members or tribal entities are involved in a dispute arising on the reservation, and questions of tribal law are raised. *See Bruce H. Lien Co. v. Three Affiliated Tribes*, 93 F.3d 1412, 1420 (8th Cir. 1996)("In this case many of the parties are Tribal entities or members and the dispute arises from Tribal governmental activity involving a project located within the borders of the reservation. Under these facts, exhaustion of

tribal remedies is especially appropriate.").

Commentators agree that this is a complicated area of law. The Supreme Court has left open questions and has not been consistent in application of its own precedent. This Court accordingly thinks it helpful, at this juncture, to summarize the historical development of the Supreme Court's case law and then to set forth the factors, trends, and distinctions that this Court concludes are vital to the tribal exhaustion analysis in order to make sense of the immediate case. As one leading commentator noted, "[r]ather than extend some of the [Supreme] Court's dicta into unworkable formulaic categories, lower courts have the ability to make distinctions that make sense." *See* Sarah Krakoff, *Tribal Civil Jurisdiction Over Nonmembers: A Practical Guide for Judges*, 81 U.COLO.L.REV. 1187, 1234 (2010).

### A.  Historical Development of Case Law

The 1959 case of *Williams v. Lee*, 358 U.S. 217 (1959), provides a useful starting point. In *Williams*, Hugh Lee, a non-Indian, brought suit in Arizona state court against Paul Williams, who was a Navajo Indian. Williams purchased goods at Lee's store on the reservation and failed to pay for them. Williams argued that exclusive jurisdiction lay in the tribal courts and the Supreme Court agreed. Noting that the Navajo courts exercise broad criminal and civil jurisdiction, which covers suits by outsiders against Indian defendants, the Court found that it was "immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there." *Williams,* 358 U.S. at 222.

In the 1981 *Montana v. United States* case, however, the Supreme Court began to close off particular subject matter areas from the reach of tribes' authority to govern nontribal members, in an *ad hoc,* piecemeal approach – what some commentators have labeled as  "implicit divestiture"

14

of tribal power. *See* Sarah Krakoff, *Tribal Civil Jurisdiction Over Nonmembers: A Practical Guide for Judges*, 81 U.COLO.L.REV. 1187, 1208 (2010); *See also* COHEN'S HANDBOOK § 4.02[3][c][ii] at 241. In *Montana*, the Court concluded that regulation of hunting and fishing by nonmembers on non-Indian fee lands within reservation boundaries bore "no clear relationship to tribal self-government or internal relations," and hence was not part of the Crow Tribe's inherent sovereign authority. *Montana*, 450 U.S. at 564-65. The Supreme Court established a general principle that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. *Id.* While tribes have authority to exercise civil jurisdiction over their own members, "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Id.* at 564. Generally, therefore, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565.

While asserting this principle, the *Montana* Court also announced two exceptions to this "general proposition". The first exception recognizes tribal power to regulate nonmembers when they "enter consensual relationships with the tribe or its members." *Id.* This exception refers to "private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they (or their employers) entered into." *Nevada v. Hicks*, 533 U.S. 353, 372 (2001). This first exception has been applied to support jurisdiction whether the relations are commercial or noncommercial, as long as the claim arose out of that relationship. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.02[3][c][ii] n.95 at 236 (Nell Jessup Newton ed., 2012)(hereinafter, COHEN'S HANDBOOK). Under the second exception, a tribe may exercise "civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or

15

welfare of the tribe." *Montana*, 450 U.S. at 566.

Only a few years after *Montana*, however, the Supreme Court decided two cases involving nonmember defendants challenging tribal court jurisdiction and appeared to diverge from *Montana's* approach. Neither of these cases applied the *Montana* presumption against tribal authority nor did either directly address whether tribal court jurisdiction would be upheld. Instead, in these two cases, the Court developed the tribal court exhaustion doctrine, which requires defendants to exhaust their remedies in tribal court before challenging tribal jurisdiction in federal court. *See National Farmers Union Ins. Co. v. Crow Tribe of  Indians*, 471 U.S. 845 (1985), and *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9 (1987).

In *National Farmers*, the Court announced that "Congress is committed to a policy of supporting tribal self-government and self-determination." *Nat'l Farmers*, 471 U.S. at 856. To further that policy, the Court found that the question of whether tribal courts have jurisdiction over a matter involving non-Indians in civil cases should first be addressed in the tribal courts. *Id*. The Supreme Court explained further in *Iowa Mutual Insurance Company* that "[t]ribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty," and "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." *Iowa Mut.*, 480 U.S. at 18.

The Supreme Court clearly held that, after the parties have exhausted the remedies available in a tribal court, a district court has federal question jurisdiction to review whether a tribal court has exceeded the lawful limits of its jurisdiction. *Nat'l Farmers*, 471 U.S. at 856; *see also Iowa Mut.,* 480 U.S. at 16 (applying *National Farmers'* exhaustion rule to diversity cases and holding that, in such cases, a federal court should "stay its hand in order to give the tribal court a full opportunity to determine its own jurisdiction"). The requirement of exhaustion permits a "full record to be

developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed [in the federal district court] . . . .   [It will also] encourage tribal courts to explain to the parties the precise basis for accepting jurisdiction, and will also provide other courts with the benefit of their expertise in such matters in the event of further judicial review." *Nat'l Farmers*, 471 U.S. at 856-57.

Subsequent to *National Farmers* and *Iowa Mutual*, "[a]dvocates and lower courts may well have surmised that *Montana* itself was the exception rather than the rule." Krakoff, *supra* at 1212. "*Strate v. A-1 Contractors* [520 U.S. 438 (1997)] would prove them wrong." *Id.* In *Strate* and three subsequent cases, by way of enumerated exceptions and inexplicit trends, the Supreme Court resumed the imposition of limitations on the power of Indian tribes to exercise civil adjudicative authority over the conduct of nonmembers in Indian country.  *See Strate v. A-1 Contractors,* 520 U.S. 438, 442 (1997) (holding that tribal court had no jurisdiction over a tort claim arising from an automobile accident involving non-members on a state-owned right-of-way across tribal trust land in Indian Country); *Atkinson Trading Co., Inc. v. Shirley,* 532 U. S. 645 (2001 ) (holding that tribal court  lacked authority to impose tax on nonmember guests of hotel, which was located on non-Indian fee land); *Nevada v. Hicks*, 533 U.S. 353 (2001)(holding that tribal court has no authority to regulate nonmember state police officers investigating an off-reservation crime at a residence which was on tribal land); *Plains Commerce Bank  v. Long Family Land and Cattle Co.,* 554 U.S. 316 (2008) (holding that tribal court lacked jurisdiction over the sale of non-Indian fee land by a non-Indian bank to other non-Indians).

Though a federal court has jurisdiction to hear a case originating within Indian Country, under *National Farmers* and *Iowa Mutual*, a federal court must abstain until the plaintiff has exhausted his or her remedies in tribal court to allow the tribal court to determine its own

17

jurisdiction over the matter.  The Supreme Court has now imposed certain rules and exceptions (in addition to the exception contained in *Montana*) that limit the exhaustion doctrine, on a case-by-case basis.   The Tenth Circuit summarized the possible exceptions in *Burrell v. Armijo,* 456 F.3d 1159, 1168 (10th Cir. 2006) :

> (1) "where an assertion of tribal jurisdiction 'is motivated by a desire to harass or is conducted in bad faith,' "  *National Farmers*, 471 U.S. at 857 n.21 (internal citation omitted); (2) "where the [tribal court] action is patently violative of express jurisdictional prohibitions,", *id.*; (3) "where exhaustion would be futile because of the lack of an adequate opportunity to challenge the [tribal] court's jurisdiction," *id.*; (4) '[w]hen ... it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by [the  main rule established in *Montana v. United States*]," *Strate v. A-1 Contrs.*, 520 U.S. 438, 459 n. 14; or, (5) it is otherwise clear that the tribal court lacks jurisdiction so that the exhaustion requirement " 'would serve no purpose other than delay,' " *Nevada v. Hicks*, 533 U.S. 353, 369 (2001)(internal citation omitted).

In addition to these enumerated exceptions, certain other special factors have been developed in this area of law, that are relevant to this case.  The interaction of two of these appears to drive the analysis when considering a tribal court's civil jurisdiction over a case in which a nonmember is a party:  (1) the party status of the nonmember; that is, whether the nonmember party is a plaintiff or a defendant; and (2) whether or not the events giving rise to the cause of action occurred within the reservation.

As to the first factor, the Supreme Court has repeatedly demonstrated its concern that tribal courts not require defendants who are not tribal members to "defend [themselves against ordinary claims] in an unfamiliar court."  *Strate*, 520 U.S. at 459; *see also Hicks*, 533 U.S. at 358 n.2 ("we have never held that a tribal court had jurisdiction over a nonmember defendant.  Typically, our cases have involved claims brought against tribal defendants.  *See, e.g., Williams v. Lee*, 358 U.S. 217 . . . .")  No such concern about nonmember plaintiffs has been found.  *See*, *e.g.*, *Williams v. Lee*, 358 U.S. 217 (1959) (where the nonmembers are *plaintiffs*, and the claims arise out of commercial

activities within the reservation, the tribal court may exercise civil jurisdiction).[7]  Conversely, where

the nonmembers are *defendants* (and objecting to being in tribal court), the Court has thus far held

that the tribes lack jurisdiction, irrespective of whether the claims arose on Indian lands.  *See Hicks*,

533 U.S. at 356; *Montana*, 450 U.S. at 547.  Furthermore, where *neither* party is a tribal member,

the Supreme Court has held that the tribe lacks jurisdiction.  *See Strate*, 520 U.S. at 456-59.  In this

case, three of the Defendants are nonmembers of the Tribe, however they filed the motion to

dismiss, seeking adjudication of this matter in Tribal Court.  Consequently this factor does not

operate against exhaustion of tribal remedies.

A second factor concerns the status of the land where the conduct at issue occurred.  *Strate*

and *Atkinson,* like *Montana,* occurred on non-Indian land, a fact which was important in the analysis

of each of these cases.  "Prior to *Hicks*, the Court consistently confined its use of the *Montana* test

to assertions of tribal authority over nonmembers' conduct on non-Indian fee land, or on land

deemed to be the equivalent thereof."  COHEN'S HANDBOOK § 4.02[3][c][ii] at 238.

In the 2001 case of *Nevada v. Hicks*, the Supreme Court was presented with a case that

occurred on tribal land.  In that case, the Supreme Court addressed a question still left open by

*Montana*:  does *Montana* apply to all non-member activity, irrespective of land status?  In other

words, does the *Montana* presumption that tribes lack jurisdiction over nonmembers apply to

activity on tribal land? The *Hicks* case involved state police officers investigating an off-reservation

crime at the residence of Hicks, which was on tribal land.  In that case, the Supreme Court rejected

Hicks's argument that the tribe had the authority to regulate the state officers' behavior, even though

---

[7]The Court's recent decisions in *Hicks* and *Strate* reaffirm the validity of *Williams*. The *Hicks* court cited *Williams* as an example of "private individuals who voluntarily submitted themselves to tribal regulatory jurisdiction by the arrangements that they . . . entered into", *Hicks*, 533 U.S. at 372, and characterized *Williams* as a case involving "claims brought against tribal defendants." *Id*. at 358 n.2; *see also Strate*, 520 U.S. at 457 (listing *Williams* as a case fitting within *Montana's* first exception).

the alleged violations by the officers occurred at Hicks's home, located on trust land within the tribe's reservation. *Id.* at 359-60. Rather, Justice Scalia, writing for the majority, concluded that "[t]he ownership status of land . . . is only one factor to consider in determining whether the regulation of the activities of nonmembers is 'necessary to protect tribal self-government or to control internal relations.' " *Id.* at 360. The Court recognized, however, that in some cases, land ownership may "be a dispositive factor" in establishing tribal regulatory jurisdiction over non-Indians. *Id.*

"The Supreme Court has not explained whether, as a general matter, the *Montana* analysis should be applied to tribal regulatory jurisdiction on Indian-owned land." COHEN'S HANDBOOK § 4.02[3][c][i] at 234 (discussing the *Hicks* case). The Court agrees with Cohen's analysis and finds that the Supreme Court has engaged in confusing, contradictory approaches to tribal exhaustion that leaves lower courts bereft of consistent, guiding principles. Where, as here, the allegedly tortious activities occurred, almost without exception, on tribal land, it remains unclear whether courts must apply the *Montana* analysis and presumption against tribal authority over non-Indians. In light of the confusing approach of the Supreme Court in these matters, in an abundance of caution, this Court will apply the *Montana* analysis to the facts of this case, despite the fact that the core actionable conduct – termination of the contracts and revocation of the gaming license – occurred on-reservation, and the potential impact on the tribe is clear. The Court is nevertheless mindful that "tribes will normally possess regulatory jurisdiction over nonmembers engaging in activities on tribal land in the absence of the powerful countervailing state interests, such as existed in *Hicks*."

COHEN'S HANDBOOK § 4.02[3][c][i] at 234-235.[8]

If none of the exceptions or special factors prohibits consideration of the tribal exhaustion rule, then the court should engage in an analysis "based on comity concerns for Indian tribes in maintaining their remaining sovereignty." *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1507 (10th Cir. 1997). These comity concerns, which were articulated by the United States Supreme Court in *National Farmers*, advance three discrete interests: (1) furthering congressional policy of supporting tribal self-government; (2) promoting the orderly administration of justice by allowing a full record to be developed in the tribal court; and (3) obtaining the benefit of tribal expertise if further review becomes necessary." *Id.* (citing *Nat'l Farmers*, 471 U.S. at 856-57).

When the dispute at issue arises on the reservation, the *National Farmers* comity concerns "almost always dictate that the parties exhaust their tribal remedies before resorting to the federal forum." *Texaco, Inc. v. Zah*, 5 F.3d at 1374, 1378 (10th Cir. 1993); *see also Kerr-McGee Corp.*, 115 F.3d at 1507 ("[T]his court at times abstains without making a detailed comity analysis, holding that 'when the dispute is a "reservation affair" there is no discretion not to defer.'" (citations omitted). On the other hand, when the dispute involves non-Indian activity occurring outside the reservation, the court must assiduously examine the *National Farmers* factors to determine whether comity concerns invoke the tribal exhaustion rule.

Against the backdrop of the historical development of law in this area, the Court will analyze the arguments of the parties in this case.

---

[8] With regard to the second critical factor, most courts have placed weight upon the territorial component, i.e., whether or not the events giving rise to the cause of action occurred within the reservation. *See Merrion v. Jicarilla Apache Tribe, et al.*, 455 U.S. 130, 142 (1982) ("[A] tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe.").

### III.   Legal Analysis

#### A.  Exhaustion of Tribal Remedies

As an initial matter, Plaintiffs argue that they have exhausted tribal court remedies on issues regarding revocation of Mr. Fine's tribal gaming license and termination of the Consulting Agreement, which, they assert, translates into the prerequisite exhaustion of tribal remedies, for purposes of the immediate litigation.  The Court has reviewed the procedural history of this matter in tribal forums, based on all documents provided to the Court.  The proceedings before the Pojoaque Pueblo Gaming Commission, Tribal Court (J. Pro Tem June L. Lorenzo), and the Pojoaque Tribal Council were all directed at the issue of the propriety of revocation of Fine's gaming license and as well as the issue of expiration of a gaming license upon termination of employment.  (*See* Docket Nos. 31 and 34, and all related documents filed in conjunction therewith). The Court finds that Plaintiffs have not in fact pursued a tort action against these five individual Defendants in Tribal Court.  In fact, Plaintiffs themselves note that the "improper revocation, *in part*, forms the basis for this lawsuit."  Resp. Br. at 19 (emphasis added).  Resolution of this gaming license issue is in no way an exhaustion of the tort issues that have been raised by Plaintiffs against the five individual Defendants in this matter.  The Court will therefore turn to the question of whether exhaustion is required in this case.

#### B.  Exceptions to the Tribal Exhaustion Rule

The tribal exhaustion doctrine applies, absent any exceptional circumstances.  Thus, it is incumbent upon this Court to examine Plaintiffs' arguments that the following three exceptions to exhaustion apply here: (1) the *Montana* jurisdiction rule, (2) bad faith and delay, and (3) futility.

### 1.  The *Montana* Jurisdiction Rule

Plaintiffs' strongest argument against imposition of the exhaustion doctrine is that the Tribal Court has no jurisdiction over them because they are non-Indians.  *Montana* articulates the general rule that "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation."  450 U.S. at 564.  Generally, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe."  *Id*. at 565.  But there may be cases in which inherent civil authority will extend to the conduct of non-Indians on reservations.  First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases or other arrangements."  *Id*.  Second, "[a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Id.* at 566.  *See MacArthur v. San Juan County*, 309 F.3d 1216, 1222 (10th Cir. 2002).  The Court must therefore consider whether either of the exceptions to the general *Montana* jurisdictional rule against tribal exhaustion apply in this case.

### a.  The First *Montana* Exception Applies to This Case

Pursuant to the first exception to the  *Montana* rule, two elements must be shown: (1) that Plaintiffs have a consensual relationship with the tribal entity;  and, (2) that Plaintiffs' claims against the Defendants in this matter have a logical relationship (nexus) to the underlying consensual

relationship.  *Atkinson Trading Co.,* 532 U.S. at 655-56.  In other words, there must be a colorable[9] basis for the exercise of tribal court jurisdiction under *Montana*, even where, as here, Plaintiffs claim that Defendants acted in an *ultra vires* manner.

The first element has been met.  Plaintiffs allege in their Complaint and it is undisputed that Plaintiffs entered into two contracts with two tribal corporations, collectively known herein and in the agreements as "the Company", and that these two corporations are owned by Buffalo Thunder Development Authority, a political subdivision and unincorporated instrumentality of the Pueblo of Pojoaque.  The Court construes this to mean that Plaintiffs entered into consensual, contractual relationships with the Tribe.

What remains to be answered, under *Montana,*  however, is whether there is a sufficient connection between Plaintiffs' two agreements with the Tribe, and Plaintiffs' claims of tortious interference with these same two contracts by the named Defendants, sufficient to justify this Court finding a colorable basis for the exercise of tribal court jurisdiction.  In fact, this is what is squarely at issue in this lawsuit against Defendants.  The Court is convinced that the allegedly tortious acts by Defendants are integrally related to Plaintiffs' two agreements with the Tribe.  Plaintiffs' tort claims arise in large measure from termination of these contracts, and thus are directly related to the consensual relationships involved.  The Court concludes that a "consensual relationship" that qualifies under the *Strate* case, is present in this case.  *Strate*, 520 U.S. at 456.  *See* Krakoff, *supra*

---

[9]In deciding whether or not there is a colorable basis for the exercise of tribal jurisdiction, the Supreme Court has made clear that, in applying exceptions "to nonmembers . . . , a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction."  *Strate v. A-1 Contractors*, 520 U.S. at 453.  As shown by prior proceedings in Tribal Court, clearly the Tribe has legislative jurisdiction to regulate the gaming license and other issues collateral to the immediate litigation.  If a tribe has power to apply its law to govern a dispute concerning a non-member, then its courts likely can hear the claim.  Conversely, if a tribe is not empowered to apply its law to that dispute, then its courts lack adjudicative jurisdiction over the claim. *See* COHEN'S HANDBOOK § 7.01 at 598.  Here, the Tribe has shown its power to apply its law to a collateral matter, i.e., the matter involving Plaintiff Fine's license revocation. There is nothing in the record to indicate that the Tribe lacks power to apply its laws to this tort claim.

at 1215 ("After *Strate*, it is safe to assume that only claims arising directly out of a consensual relationship, such as a breach of contract, violation of a licensing, royalty, or other agreement, or perhaps *a tort arising from the breach of any such agreement or arrangement, will suffice*.")(emphasis added). Krakoff commented further on the issue of how to apply the *Montana* exceptions in the judicial context: "To summarize, claims arising directly from a consensual relationship with a tribe or tribal members fall safely within the Court's categories of tribal jurisdiction. This is so even in cases where the consensual relationship is a contract and the claim sounds in tort, so long as the claim can fairly be described as a direct or anticipated outcome of the consensual relationship." *Id*. at 1234.

The Court concludes that a colorable basis exists for the exercise of tribal jurisdiction under *Montana*, even though Plaintiffs characterize Defendants' actions as being without authority from the Company. The Defendant tribal officials, officers, employees and attorneys are being sued for interference with the tribal entities' contracts (and gaming license) with the Plaintiffs, and for termination of those contracts (and gaming license). Even if Defendants' actions were *ultra vires*, and even though there is no question that these Defendants personally never had any kind of consensual relationship with the non-Indian Plaintiffs, this does not *ipso facto* excuse exhaustion of tribal remedies. *See Burrell vo Armijo*, 456 F.3d 1159, 1164-69 (10th Cir. 2006). The *Burell* case involved a situation wherein the plaintiffs sued the Pueblo of Santa Ana and various individual tribal officials, alleging *ultra vires* conduct by those officials. Despite these facts, the Tenth Circuit did not disapprove the district court's requirement of exhaustion of tribal remedies (although reversing on other grounds). Tribal jurisdiction under the first exception in *Montana* – and a plaintiff's duty to exhaust tribal remedies to give a tribal court the first opportunity to rule on that jurisdiction – do not evaporate just because a plaintiff alleges that a defendant engaged in misconduct or otherwise

25

acted outside of the scope of his/her authority.

Given the fact that the "consensual-nexus" test has been met, the Court concludes that *Montana*'s first exception has been satisfied,

### b.  The Court Does Not Reach the Second *Montana* Exception

The Court notes that the issues in this case are related to the economic security of the Tribe, because Plaintiffs were consultants hired by the Tribe to address serious financial issues involving the Tribe's casino, Buffalo Thunder.  Nonetheless, the Court concludes that the facts in this case fit more comfortably within the first *Montana* exception than within the second exception, so finds no need to decide whether the second exception also applies.

### 2.   Bad Faith and Delay Tactics Exception

Plaintiffs also contend that the license revocation action, filed with the PPGC, was filed for the purpose of delaying the immediate litigation, and that Defendants' raising the exhaustion requirement in this case is in bad faith and serves no purpose other than delay.  Resp. Br. at 20.

The Court finds no merit to this argument.  Mere allegations of bad faith are not enough to avoid tribal court adjudication.  Moreover, the fact that the agreements involved in this dispute, Exs. 1 and 2, expressly provide for Tribal Court jurisdiction operates against a finding that Tribal Court jurisdiction was asserted in bad faith here.

As for delay, any plaintiff, wishing to avoid the requirement of exhaustion of tribal remedies, could argue that the only purpose of a  motion seeking exhaustion, is delay or harassment. Plaintiffs' criticism of tribal proceedings collateral to the tort claims they have  brought, their desire to avoid going to tribal court and lamenting the delay this might cause – none of these arguments excuses the requirement of exhaustion of tribal remedies.  Plaintiffs' contention that no purpose

26

other than delay will be served if the exhaustion requirement is imposed ignores the rationale and purpose of requiring exhaustion of tribal remedies (all of which has been set forth herein). Plaintiffs also argue that certain of their claims arose outside the territorial jurisdiction of the Tribe, which forecloses tribal jurisdiction over the tort claims at issue in their lawsuit. The Court has rejected this factually unsupported contention herein also. In short, Plaintiffs have not established that the Tribal Court will lack adjudicatory authority over this dispute, and that the otherwise applicable exhaustion requirement must give way because it would serve no purpose other than delay. *See Strate*, 520 U.S. at 459 n.14. This Court is requiring exhaustion because the jurisdiction of the Tribal court appears to be likely. *See* Krakoff, *supra* at 1216.

### 3. Futility

Plaintiff's futility argument centers around the premise that the tribal court system is not capable of hearing this matter because of who the Defendants are, and because of their important influence over that court system. Specifically, Plaintiffs assert that George Rivera is Pojoaque Governor and serves as the Presiding Judge of the Tribal Court of Appeals, or as the person appointing a special appellate court. *See* Ex. C. They argue that "[e]ither way, Rivera's role in the tribal proceeding demonstrates that the Pojoaque court system is simply unable to act as an impartial decision-maker." Resp. at 21. Plaintiffs presume that the lower Tribal Court decision would be slanted, given Rivera's possible role on the Court of Appeals; that he would not recuse from the Court of Appeals, even in this case where he is a named party; and, that if he appointed a special appellate court, it would be biased.

First of all, allegations of local bias and tribal court incompetence are not exceptions to the exhaustion requirement. *Iowa Mutual*, 480 U.S. at 19. A party asserting futility cannot merely

assume that it would not receive a fair trial in tribal court -- it must present evidence of bias. *Duncan Energy Co. v. Three Affiliated Tribes of Fort Berthold Reservation*, 27 F.3d 1294, 1300 (8th Cir. 1994) (citing *Nat'l Farmers*, 471 U.S. at 856). It is well settled that speculative allegations of bias or futility do not excuse exhaustion of tribal remedies.[10] Plaintiffs have presented no such actual evidence. Absent any indication of bias, this Court must presume the Tribal Court to be competent and impartial, and that it will follow the proper procedures, including those for recusal, should any conflict arise – just as this Court would presume with a non-tribal court. *See Duncan Energy Co.*, 27 F.3d at 1301.

## C.  Special Factors Present in This Case

Exhaustion of tribal remedies is required as a matter of comity, not because there is a lack of subject matter jurisdiction in this Court. *Brown v. Washoe Hous, Auth.*, 835 F.2d 1327, 1328 (10th Cir. 1988). The tribal exhaustion doctrine applies, absent any exceptional circumstances, none of which has been established by Plaintiffs in this matter. Although Plaintiffs are nonmembers, seeking to avoid tribal court civil jurisdiction, they fall within the *Williams* rule. They have filed this lawsuit, for claims that are related to their contracts with the Tribe, for allegedly tortious acts committed by tribal officials and employees, that occurred almost without exception on tribal lands, having agreed in their contracts to be subject to exclusive personal and subject matter jurisdiction of the Tribal Court. Although this case is brought for claims sounding in tort rather than breach of contract, this Court concludes that civil tribal jurisdiction does not turn on finely-wrought

---

[10] Furthermore, the "futility exception applies generally only when the tribe does not have a functioning court system." COHEN'S HANDBOOK at § 7.04[3] at 632, citing *Comstock Oil & Gas, Inc. v. Ala. & Coushatta Indian Tribes*, 261 F.3d 567, 572-73 (5th Cir. 2001) and *Krempel v. Prairie Island Indian Cmty.*, 125 F.3d 621, 622 (8th Cir. 1997).

distinctions between contract and tort.  Nonmembers of a tribe who choose to affiliate with Indians

or their tribes in consensual relationships occurring on Indian land may anticipate tribal jurisdiction

when their contracts affect the tribe or its members.  Jurisdiction may reasonably be said to result

as a consequence of the deliberate actions of those who enter tribal lands to engage in commerce

with Indians.  Voluntary entry into the two contracts with tribal entities, can be considered a consent

to tribal court jurisdiction on tort claims arising out of that relationship.

As noted by the court in *Smith v. Salish Kootenai College*, 434 F.3d 1127, 1140-1141 (9th

Cir. 2006),

> So long as Indians "remain a 'separate people, with the power of regulating their internal and
> social relations,' . . . . [making] their own substantive law in internal matters, and . . .
> enforc[ing] that law in their own forums," tribal courts will be critical to Indian self-
> governance.  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55-56, 98 S.Ct. 1670, 56 L.Ed.2d
> 106 (1978)(citations omitted)(quoting *United States v. Kagama*, 118 U.S. 375, 381-82, 6
> S.Ct. 1109, 30 L.Ed. 228 (1886)); *see Iowa Mut..*, 480 U.S. at 14, 107 S.Ct. 971.  The Tribes'
> system of tort is an important means by which the Tribes regulate the domestic and
> commercial relations of its members.  Tort liability has historically been a means for
> compensating injured parties and punishing guilty parties for their willful or negligent acts
> . . . . The Tribes have a strong interest in regulating the conduct of their members; it is part
> of what it means to be a tribal member.  The Tribes plainly have an interest in compensating
> persons injured by their own; . . . .

For all of these reasons, the Court concludes that Plaintiffs' status as non-Indians does not

obviate against the Tribal Court exercising jurisdiction over them.  The general rule established by

the Supreme Court in *Montana*, that the inherent sovereign powers of an Indian tribe do not extend

to the activities of nonmembers of the tribe, is inapplicable here.

## D.  The Court Has No Discretion Not To Defer to the Tribal Court Based on Comity

Although the Court finds that exceptions to the tribal exhaustion doctrine do not apply, it is

still necessary to address the issue of comity.  The comity concerns that provide a basis the tribal

exhaustion doctrine, as articulated by *National Farmers,* 471 U.S. at 856-57, are:  (1) furthering congressional policy of supporting tribal self-government; (2) promoting the orderly administration of justice by allow a full record to be developed in the tribal court; and (3) obtaining the benefit of tribal expertise if further review becomes necessary.

If these policies behind the doctrine are served by applying it, "comity requires the parties to exhaust their tribal remedies before presenting their dispute to the district court." *Kerr-McGee Corp.,* 115 F.3d at 1507 (quoting *Texaco v. Zah,* 5 F.3d 1374, 1378 (10th Cir. 1993)).  It is unnecessary, however, for this Court to engage in a detailed comity analysis, because none of the recognized exceptions to the doctrine apply, and the dispute concerns a "reservation affair" and "arises on the reservation,[11]" so "there is no discretion not to defer" to the tribal courts.  *Kerr-McGee Corp.*, 115 F.3d at 1507 (When the activity at issue arises on the reservation, comity concerns almost always dictate that the parties exhaust their tribal remedies before resorting to the federal forum – a fact that justifies abstention of a federal court without making a detailed comity analysis).

Other courts have determined that cases such as this, which concern "performance of contracts relating to a gaming operation located on the Tribe's reservation," are "reservation affairs" for which comity requires exhaustion of tribal remedies before suit in federal court.  *See, e.g., Potaluck Corp. v. Prairie Band of Potawatomi Indians*, 2000 WL 1721797 at *2 (D.Kan. 2000) (involving contract and/or tort claims between a non-Indian plaintiff and an Indian tribe defendant), and *Calumet Gaming Group-Kansas, Inc. v. Kickapoo Tribe of Kan.,* 987 F.Supp. 1321, 1329 (D.Kan. 1998) (non-Indian gaming consultant brought action against Indian tribe and judge of tribal court; district court held that this action concerning the performance of contracts relating to a

---

[11] This Court concludes that this case "arises on the reservation,"  because, as discussed herein,  with one exception, occurrences which gave rise to this litigation occurred on tribal land.

gaming operation located on the Tribe's reservation was a "reservation affair"). Because a federal court's exercise of jurisdiction over matters relating to reservation affairs can impair the authority of tribal courts, the Supreme Court has concluded that, as a matter of comity, the examination of tribal sovereignty and jurisdiction should be conducted in the first instance by the tribal court itself. *See Nat'l Farmers*, 471 U.S. at 856.

## VI. Conclusion

The Defendant's Motion to dismiss is **granted** without prejudice. The Court notes that neither party has requested a stay of this litigation, pending exhaustion of tribal remedies. Exhaustion includes, at a minimum, tribal appellate court review. The parties are required to exhaust tribal court remedies, on the claims that have been brought by Plaintiffs in this matter before the federal district court will become involved in this dispute.

**IT IS THEREFORE ORDERED** that the Defendants' Motion to Dismiss for Failure to Exhaust Tribal Remedies (Docket No. 13) is **GRANTED** and this action is dismissed without prejudice so that the Plaintiffs may pursue their claims in the Tribal Court of the Pueblo of Pojoaque.

_____

**SENIOR UNITED STATES DISTRICT JUDGE**

31